UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROBERT MUSANTE,

                         Plaintiff,

          -v-                                              6:15-CV-259

MOHAWK VALLEY COMMUNITY
COLLEGE,

                         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

LEVINE, BLIT LAW FIRM                     LEWIS G. SPICER, ESQ.
Attorneys for Plaintiff
499 South Warren Street, Suite 500B
Syracuse, NY 13202

OFFICE OF FRANK W. MILLER                 CHARLES C. SPAGNOLI, ESQ.
Attorneys for Defendant                   FRANK W. MILLER, ESQ.
6575 Kirkville Road
East Syracuse, NY 13057

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

Plaintiff Robert Musante ("Musante or "plaintiff"), a former faculty member, filed this

civil rights lawsuit against defendant Mohawk Valley Community College ("MVCC" or the

"College") after it terminated him following an investigation into student complaints accusing him of classroom misconduct.[1]

Musante asserts claims for age and gender discrimination and retaliation (Second, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and related provisions of the New York State Human Rights Law ("HRL") as well as a defamation claim based on state law (Eighth Cause of Action).

On June 7, 2016, MVCC moved under Federal Rule of Civil Procedure ("Rule") 56 seeking summary judgment in its favor on Musante's discrimination, retaliation, and defamation claims. The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. BACKGROUND

In 2003, MVCC hired Musante, who holds a Ph.D. in English Literature from Middle Tennessee State University, as a professor in its Humanities Department. Def.'s Rule 7.1 Statement ¶ 2; Musante Aff. ¶¶ 3, 11. Plaintiff became an Assistant Professor in 2006 and, in 2009, the College promoted him to the title of Associate Professor. Def.'s Rule 7.1 Statement ¶ 2; Musante Aff. ¶¶ 4-5. In each of these three roles, plaintiff taught English and Literature courses to college-age students as well as to certain local high school students who were permitted to enroll in the College's course offerings. Def.'s Rule 7.1 Statement ¶ 3.

---

[1] Musante's eight-count complaint initially named as defendants MVCC's Director of Human Resources Kimberly Evans-Dame ("Evans-Dame") and College administrative employee Kim Overrocker ("Overrocker"). However, on September 3, 2015, the parties stipulated to the dismissal of plaintiff's 42 U.S.C. § 1983 due process claim (First Cause of Action) as well as to the dismissal of plaintiff's individual claims against Evans-Dame and Overrocker.

Musante's course curriculum included teaching material on "subjects that incorporate[d] themes of human sexuality, relationships[,] and censorship from the works of classic authors such as Shakespeare, Chaucer, Sagan, Blake[,] and many others." Musante Aff. ¶ 11.

As Musante explains, he approached these subjects by treating his students "like the adults they are." Musante Aff. ¶ 12. For instance, plaintiff would "incorporate personal anecdotes and stories into [class] lessons because [he] felt it would be more effective" at connecting with these mostly college-age students. Id. ¶¶ 15, 36. However, plaintiff denies ever discussing "any explicit sexual stories" or making reference to any of his "own personal sexual activity." Id. ¶ 37.

According to Musante, a number of younger and/or female colleagues in MVCC's English department, all of whom taught the same or similar course material, embraced "similar teaching styles." Musante Aff. ¶¶ 15-17, 38; see also Def.'s Motion Ex. 10.

Musante maintains that he "had a good and honest relationship" with his students throughout his "entire tenure at MVCC." Musante Aff. ¶ 14. This relationship derived from plaintiff's course syllabus, which always clearly outlined the rules for his classes. Id. ¶ 13. Plaintiff "always sought to implement those rules fairly and without prejudice" by, inter alia, taking action when a student was "excessively late" and refusing to tolerate class disruptions. Id.

These day-to-day disciplinary considerations aside, Musante claims that he consistently received positive performance reviews from the College and was "well regarded by colleagues and students." Musante Aff. ¶ 6. For instance, plaintiff's most recent performance evaluation was "entirely positive." Spicer Aff. Ex. A.

However, Musante's tenure at MVCC was not without incident.  In May 2010, the College disciplined him for displaying a "blow-up doll" on campus during school hours.  Evans-Dame Aff. ¶ 4; Musante Aff. ¶ 22.  According to Evans-Dame, she observed plaintiff from her office window "parade" this doll around campus, showing it to "a group of faculty and staff members and laughing about it."  Evans-Dame Aff. ¶ 3.

Musante, for his part, admits that he was in possession of a blow-up doll, but denies that he "paraded" it around campus.  Musante Aff. ¶¶ 22-24.  Instead, plaintiff explains that a student gave him the doll as a joke, or gag gift, during an end-of-the-semester class pizza party.  Id. ¶ 23.  Plaintiff claims he was "embarrassed" but "accepted the gift because it was meant as an act of gratitude and kindness" from his students.  Spicer Aff. Ex. B.  Plaintiff initially tried to hide the doll by stuffing it into his backpack and left the classroom.  Musante Aff. ¶¶ 23-24.

As Musante detailed in a letter he later wrote to Lewis Kahler, Dean of the Center for Arts and Humanities ("Dean Kahler"), apologizing for the incident, he had walked to the side entrance of a campus building to "discretely attempt to deflate" the doll when "two teachers" came upon the scene "and did not like it."  Spicer Aff. Ex B.

Although Musante "tried to explain that it was a gift," at that point Dean Kahler "walked out of the side entranceway to [the campus building] and saw the doll as well."  Spicer Aff. Ex. B.  Plaintiff's written explanation indicates that he responded by releasing some "nervous laughter" and attempting to explain the situation.  Id.  According to plaintiff, the whole incident left him feeling "helpless, embarrassed, nervous, and frustrated."  Id.

The parties dispute the outcome and effect of the disciplinary process resulting from the blow-up doll incident.  According to Evans-Dame, the parties reached an agreement that

- 4 -

would reduce the written warning Musante initially received in May 2010 to an oral one provided plaintiff "went a year from the issuance of the written warning without a further violation of College Policy." Evans-Dame Aff. ¶ 4. One year after that, the oral warning would be completely removed from plaintiff's personnel file. Id. Evans-Dame maintains that plaintiff failed to reach this "second milestone" and "thus the warning remained in his file as documentation of an oral warning." Id.; see also Spicer Aff. Ex. C.

Musante disputes this explanation and contends the disciplinary matter was in fact "sunsetted"; i.e., completely "removed from [his] personnel file a few years before [his] termination." Musante Aff. ¶ 22. Indeed, the June 3, 2011 e-mail that Evans-Dame sent to plaintiff as a one-year follow-up on this issue explains that the oral warning would be removed from his personnel file by June 2, 2012. See Spicer Aff. Ex. C.

In any event, Musante continued teaching. During 2011 and early 2012, plaintiff responded to certain "student conduct problems in his class" by making "Behavior Emergency Response Team" ("BERT") reports to campus security and by entering into Teaching and Learning Agreements without first consulting his supervisor. Evans-Dame Aff. ¶ 5.

According to MVCC, these actions represented instances in which Musante "overreacted" in matters of student discipline. Evans-Dame Aff. ¶ 5. Plaintiff denies overreacting to these issues and instead maintains that he "addressed students in a direct, respectful manner when it came to discipline." Musante Aff. ¶ 25.

Eventually, Musante's classroom disciplinary practices culminated in a meeting between plaintiff, Evans-Dame, and Associate Dean Deborah Bogan ("Dean Bogan") on February 22, 2012. Def.'s Motion Ex. 19. In a "Counseling Memorandum" issued two days

later, Dean Bogan explained that plaintiff should attempt to, inter alia, "resolve behavioral issues informally whenever possible, before initiating more formal actions, such as BERT reports, incidents reports, and Teaching and Learning Agreements." Id.

Musante continued teaching. On September 30, 2013, plaintiff e-mailed Morris Pearson, MVCC's Director of Civic Responsibilities and its Chief Conduct Officer, to bring to his attention "several problems" plaintiff was having with C.D., a young African American student in his English 102 class. Def.'s Motion Ex. 20.

Among other things, Musante's e-mail to Pearson indicated that C.D. "continues to arrive in class late," "interrupts [his] teaching," "engages in a lot of arguing in class about matters that have nothing to do with literature," "mocks the literature" and lashes out at guest speakers, and had begun approaching him outside of class to engage in arguments. Def.'s Motion Ex. 20.

Pearson responded to Musante by e-mail that afternoon, explaining that C.D. had actually contacted his office about filing a written complaint of his own against plaintiff "addressing some alleged statements you made to him, etc." Def.'s Motion Ex. 20. When Dean Bogan, who had been included on Pearson's responsive e-mail, asked what type of complaint C.D. planned to file against plaintiff, Pearson explained that it was a "harassment complaint." Id.

According to Pearson's e-mail, C.D. claimed that plaintiff told him to "shut the fuck up" and to "not speak in class." Def.'s Motion Ex. 20. Pearson described the student as "very upset and shaking" and indicated the student had also complained that plaintiff "emailed his mother addressing his grades." Id. Musante denies ever telling C.D. to "shut the fuck up," and claims he never cursed at any of his students. Musante Aff. ¶¶ 26, 34. According to

plaintiff, profanity was "seldom used in class and if it was, it derived from the literature or was germane to the class discussion." Id. ¶ 35.

Musante continued teaching classes. On October 18, 2013, plaintiff called campus security to have M.M., another of his students, removed from the area outside of his classroom. Musante Aff. ¶ 27; Evans-Dame Aff. ¶ 9; Spicer Aff. Ex. F. According to the incident report plaintiff filed with campus security, this action became necessary because M.M. "stared through the window of the door to his class room giving threatening angry looks and gestures" when plaintiff refused to admit M.M. into the class room for being late. Spicer Aff. Ex. F.[2]

Initially, M.M. hoped to "clear up [the] big misunderstanding that happened earlier [that day]"; i.e., the incident that resulted in Musante having him removed by campus security, by e-mailing plaintiff a lengthy explanation about his side of the story. Def.'s Motion Ex. 22. However, plaintiff refused to open a dialogue with M.M. on the issue, responding to M.M.'s e-mail by telling him he was over the limit for class absences, had already failed plaintiff's course, and should not return. Id.

M.M. considered Musante's responses to his self-styled attempt at reconciliation to be "pathetic" and took matters into his own hands. Def.'s Motion Ex. 22. On October 21, 2013, three days after the incident with campus security, M.M. submitted to the College his own account of what led to his removal from outside of plaintiff's classroom. Id. M.M.'s written explanation also accused plaintiff of a range of classroom misconduct. Id.

---

[2] A few days later, on October 23, 2013, Musante filed a second incident report about M.M with campus security. Spicer Aff. Ex. F. According to this report, plaintiff began to fear for his well-being after a student who was present during the earlier incident with M.M. related to plaintiff that he had overheard M.M. say "I'm gonna find him [plaintiff] and beat the fucking shit out of him." Id.

According to M.M.'s complaint, Musante had very recently become "unprofessional," "extremely inappropriate and unfair on a daily basis," and "completely out of control" in his English 101 class. Def.'s Motion Ex. 22 (explaining that "[t]his was not the case until up around a couple of weeks ago though"). M.M.'s letter then went on to describe a story he claimed plaintiff had told the class about plaintiff's time in college:

> The story was called "The Midget Story" he started by asking anyone if they would be offended by the story and everyone said they weren't. The story was barely about midgets at all, it was mainly about his college sex life with a particular girl he met. He wasted the entire rest of the class up to the minute class was over with. All he talked about over and over again was him having sex with this woman and how her boobs were like "small watermelons", which is how he worded it. He told us about meeting her family and finally how they broke up he caught her having sex with a little midget woman.

Def.'s Motion Ex. 22.

M.M. further claimed that "recently every class" Musante uttered expletives like "Fuck It" multiple times each class. Def.'s Motion Ex. 22. In addition, M.M. accused plaintiff of being "very inappropriate to [a] particular girl in the class":

> [S]he is a friend of mine and [plaintiff] emails her as if he likes her more than a student. She is seventeen years old. Last week she came up to me and told me that he kept her after class and told her she was a beautiful girl and proceeded to walk with her down the hall. He keeps her after class often, usually for no reason at all other than just so he can "talk" to her . . . . she is very uncomfortable with him and told me I could use her as an example."

Def.'s Motion Ex. 22.

M.M. also claimed that Musante required the class to watch "American History X," a movie which the student characterized as "extremely inappropriate because of the nudity and racism." Def.'s Motion Ex. 22. M.M.'s complaint also expressed his belief that plaintiff was

"targeting" him: according to M.M., plaintiff forced him to stay after class because he was being "disruptive." Id. In his letter, M.M. readily conceded that he was talking during plaintiff's class but felt his disruptive behavior was justified because plaintiff, in his view, had already "wasted 25 minutes of [the students'] time and money." Id.

M.M.'s written complaint went on to accuse Musante of applying his classroom rules unfairly. Def.'s Motion Ex. 22. According to M.M., plaintiff would allow a certain female student to join class "over five minutes late every single day" even though he did not permit M.M. the same latitude on the day he refused to permit him to enter class late. Id.

Finally, M.M.'s letter stated that he "plan[ned] on transferring out of MVCC after this semester because of [plaintiff]" and stated that plaintiff "is making your college, my college, and thousands of other college[s] look very unprofessional." Id. According to M.M., "[t]he best route in [his] opinion is an investigation." Id.

M.M.'s anti-Musante polemic eventually made its way to Evans-Dame, who by then had also learned about C.D.'s complaint of a few weeks earlier. Evans-Dame Aff. ¶ 10. And although she conceded at her deposition that she was unaware of *any* student complaints about plaintiff's classroom behavior between 2010 and the initial complaint made by C.D. in 2013, Spicer Aff. Ex. J, Evans-Dame nevertheless asserts that beginning in "late October and through November, 2013, a number of other students approached the Human Resources Office or other College administrators to complain about [p]laintiff." Evans-Dame Aff. ¶ 11; Def.'s Motion Ex. 12.

On November 1, 2013, Evans-Dame e-mailed Musante seeking to set up a meeting later that day about the complaints that MVCC had received from "several students" in plaintiff's English 101 and English 102 classes. Spicer Aff. Ex. D. According to

Evans-Dame's e-mail, these students had complained that plaintiff was "[c]ursing in class or at students" and "[s]haring sexually explicit stories that students believed were unrelated to class instruction and [which] they view as inappropriate." Id. This e-mail informed plaintiff that he would be placed on paid leave while the College "further research[ed] these concerns with the students and with you." Id.

That afternoon, Evans-Dame and Dean Kahler met with Musante to inform him that he would be suspended with pay while MVCC completed an investigation into the student complaints. Evans-Dame Aff. ¶ 12. According to Evans-Dame, plaintiff "admitted to telling 'two little personal stories' during class but did not provide details at that time." Id.

MVCC characterizes Musante's behavior during this meeting as "wholly inappropriate," including being "extremely angry" and "shout[ing]" at both Evans-Dame and Dean Kahler, "and at one point he clenched his fists, contorted his face and shook his whole body in anger, such that we were concerned about his level of anger and his verbal and physical aggressiveness." Evans-Dame Aff. ¶¶ 13-14.[3]

Musante disputes this characterization and insists he did not lose his temper during this meeting. Musante Aff. ¶ 42. Rather, according to plaintiff, he was simply "confused and upset as to why [he] was being suspended, as any person would, given the circumstances." Id.

---

[3] In support of this description of the meeting, MVCC points out that Evans-Dame and Dean Kahler felt so strongly about Musante's inappropriate behavior that they felt compelled to make a written record of it. Notably, however, this did actually occur until a few *weeks* later, when they made sworn statements to campus security. Def.'s Motion Exs. 24-25 (attaching statements sworn to on November 11, 2013, and November 21, 2013).

Later that evening, around 5:34 p.m., Evans-Dame followed up with a second e-mail to Musante that reiterated he would be placed on paid leave while MVCC "process[ed]" the student complaints. Def.'s Motion Ex. 26.

In the meantime, Musante e-mailed Evans-Dame on November 4, 2013 with several lists of students he believed MVCC should contact because they could provide unbiased information about his teaching behavior in the classroom. Def.'s Motion Ex. 26; Evans-Dame Aff. ¶ 16; Musante Aff. ¶ 44.

By December 2, 2013, Evans-Dame had met with eighteen students who previously attended Musante's classes in the Spring or Fall 2013 semesters. Def.'s Motion Ex. 27. Evans-Dame produced typed summaries of these interviews, the majority of which were either neutral or seemed to cast plaintiff's classroom behavior in a somewhat favorable light. Def.'s Motion Ex. 23.

Roughly speaking, the recorded comments of seven students tended to indicate that Musante had behaved inappropriately in the classroom. Def.'s Motion Ex. 23. For instance, Evans-Dame's interview notes indicate that L.G. claimed plaintiff "would tell stories about sexual exploits in College" that "made her and other students feel uncomfortable" and that he "would draw pictures of male genitals on [the] black board." Id. L.G. also accused plaintiff of "tell[ing] negative and inappropriate stories about past students." Id.

In a similar vein, notes from Evans-Dame's interview with N.B. indicate that Musante recounted "disgusting" stories about his "personal sexual experiences in College." Def.'s Motion Ex. 23. And notes from Evans-Dame's interview with J.D., another of plaintiff's students, indicated that he told "disturbing" stories that were "about his sex life and were

disruptive." Id. Interview notes from both N.B. and J.D. also indicated that plaintiff frequently used expletives in class. Id.

However, comments from nine of these student trended toward positive appraisals of Musante. Def.'s Motion Ex. 23. For instance, notes from the interview with J.B. indicated that plaintiff is "never inappropriate" in class and expressed disappointment with the College for suspending plaintiff. Id. And interview notes from K.M., M.W., A.M., D.Y., S.D., and D.F. conveyed a similarly positive sentiment about plaintiff. Id.

A few of these recorded comments, such as those from J.C., expressed conflicting sentiments about Musante's behavior. Def.'s Motion Ex. 23. According to notes from J.C.'s interview, plaintiff "has a passion for teaching," although he "[d]oes talk sexually open during class due to the time period." Id. J.C. appeared to acknowledge that this behavior "[m]ay make others feel uncomfortable," and accordingly the student "[w]ouldn't be surprised if students had concerns about his vulgerness [*sic*]." Id.

Musante casts doubt on the veracity of the negative student comments by emphasizing that at least five of the complaining students—A.I., J.D., N.B., M.M., and C.D.—had posed ongoing disciplinary problems in his classroom, and many were failing his class at the time they chose to complain. Musante Aff. ¶¶ 29-30; see also Spicer Aff. Ex. E (attaching records of e-mail communications between plaintiff and students A.I., J.D., and N.B.). According to plaintiff, "the students who complained about [him] all had an 'axe to grind.'" Id. ¶ 32.

By this point, Musante began to suspect that MVCC "was discriminating against [him] because of [his] gender and possibly [his] age." Musante Aff. ¶ 45. According to plaintiff, the basis for this belief stemmed from several salient facts. First, plaintiff "knew that [his] female

colleagues in the English Department had a similar teaching style . . . , where they incorporated themes of human sexuality into their lessons." Id. Second, plaintiff knew that "[f]rank discussions of sex were abundant on campus." Id. ¶ 40. Third, and relatedly, plaintiff knew that the College had at one point during the 2013 school year invited a female lecturer to give a "class about the female orgasm." Id. ¶ 41.

On December 3, 2013, Musante raised his concerns in an e-mail to Evans-Dame:

> Prior to meeting with any student, I wish to know in writing what I am being charged with. With the very little information I have, I am under the impression that I am being accused of some type of sexual harassment. I am alarmed because I should not be investigated, and I believe I am being discriminated against because I am a male professor. I have taught my classes in accordance with my lessons for the assignments and material to be learned for each class, and I have not acted inappropriately. I deny any inappropriateness that I am being unfairly charged with by students and the College. My teaching has been observed many times, and my teaching style has never been questioned. Also, per my evaluations, I have demonstrated serious proficiency and support to my students in an effective learning environment.
>
> In addition, I have similar policies and rules to other professors, and I should not be treated unfairly, as I am now. Female professors exercise academic freedom in class discussion, including discussions of a sexual nature, yet I am being investigated for my methods. I feel that, as a male English professor employed by MVCC, I must be fairly allowed the same opportunity to teach my material as any other professor, regardless of my gender. I am being discriminated against as a male professor, and this investigation is unfair based on these grounds as well.
>
> With this message, I wish to bring the aforesaid concerns to the College, and I request a response regarding the discrimination against me.

Def.'s Motion Ex. 29. According to plaintiff, no representative from the College ever responded to this discrimination complaint. Musante Aff. ¶ 47. Evans-Dame, for her part, testified at her deposition that she responded to this complaint by providing plaintiff with the

- 13 -

College's "handbook," which set forth the school's policy for dealing with allegations of discrimination.  Spicer Aff. Ex. J.  Evans-Dame asserts that she also spoke to Dawson McDermott, a member of plaintiff's professional union.  Id.

However, Evans-Dame concedes that these are "the only things" she did in response to Musante's discrimination complaint.  Spicer Aff. Ex. J.  She did not, for example, review any of the course materials for any of the other professors in the English department.  Id.  After all, according to her own affidavit, she was completely certain there was no age or gender discrimination involved "because [she] was the one hearing the student complaints and investigating same."  Evans-Dame Aff. ¶ 23.  Indeed, Evans-Dame testified at her deposition that she was the *only* College representative who met with any of the students involved in the investigation.  Spicer Aff. Ex. J.

On December 14, 2013, Musante e-mailed Evans-Dame to inquire about her expectations for their next meeting:

> I have a couple questions.  About the next meeting, you stated yesterday that I will need to explain my personal stories to you.  I'm not sure what you mean.  Could you please explain for me what you wish for me to say or do?
>
> Also, I recall that you wish for me to discuss what I must do as a faculty member at MVCC.  Could you please elaborate on this for me as well?

Def.'s Motion Ex. 28.

On December 15, 2013, Evans-Dame responded:

> As you are now aware of the student concerns as provided to you last Friday in the summary, you now have an opportunity to answer to those concerns.  You may do that either in writing or in person when we meet next.

> In addition to the student's [*sic*] concerns, the College also has concerns about your ability to effectively teach students. The College cannot ignore the perceptions of the students who believe that your conduct as a professor has interfered with their learning. After all, we are all here at MVCC for our students.
>
> The College has not seen accountability from you regarding the student's [*sic*] concerns and perceptions, which is deeply concerning as the students cannot continue to be subject to your sexual[ly] explicit personal stories and inappropriate behaviors that make them feel uncomfortable in class and interfere with their learning.
>
> As you mentioned in our first meeting several days ago, you tell two (2) little personal stories in your classes as examples for student reflection and writing. Surely you remember the stories you tell in class. If we are ever going to move forward reviewing the student's [*sic*] concerns, you must address those concerns the students have with those personal sexual[ly] explicit stories. It is not what I want you to say, it is about addressing and answering to those concerns."

Def.'s Motion Ex. 28.

On January 5, 2014, Evans-Dame wrote to Musante to offer him a "very generous package should [he] elect to resign." Spicer Aff. Ex. G. This e-mail set forth the terms of the separation agreement proposed by MVCC and indicated that plaintiff was obligated to notify Evans-Dame of his decision no later than Wednesday, January 8, 2014, at 4:30 p.m. Id. According to plaintiff, this is the first time plaintiff learned that he was going to be terminated if he did not resign. Spicer Aff. Ex. J. In response, plaintiff began sending out resumes in an effort to find other employment. Musante Aff. ¶ 49.

On February 21, 2014, MVCC sent Musante a "Notice of Charge" stating that his

> continued poor judgment as a faculty member of Mohawk Valley Community College has recently resulted in numerous student complaints from the Spring 2013 and Fall 2013 semesters regarding your continued inappropriate and unprofessional behaviors. The College has provided you with detailed descriptions of the student complaints and provided you the opportunity to respond. Based

upon the student complaints and your response to those complaints, the College is terminating your employment effective immediately.

Def.'s Motion Ex. 30.

On March 11, 2014, MVCC sent Musante a "Disposition of the Notice of Charge," which observed that plaintiff had not taken advantage of any post-termination procedures, such as requesting a "Right to Meet" or a "Right to Respond," after being served with the earlier Notice of Charge. Def.'s Motion Ex. 31; Evans-Dame Aff. ¶ 29. Accordingly, plaintiff's termination from employment became final. Def.'s Motion Ex. 31. Plaintiff remains ineligible to be re-hired at the College. Evans-Dame Aff. ¶ 31.

On April 15, 2014, Musante filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging that his initial suspension and later termination from MVCC were the result of age and sex discrimination. Spicer Aff. Ex. N.

In July 2014, Musante interviewed for a substitute teaching position with Ronald Wheelock, the Superintendent of Sauquoit Valley Central School District ("SVCSD"). Musante Aff. ¶¶ 51-52; Def.'s Motion Ex. 11. According to plaintiff, Superintendent Wheelock advised him that he could not be hired at SVCSD because Overrocker, an MVCC HR employee familiar with plaintiff's termination who also happened to be the President of the SVCSD's Board of Education, told Superintendent Wheelock that plaintiff was "bad news" and that he should not be hired. Musante Aff. ¶ 52.

Overrocker denies calling Musante "bad news" or demanding that his application for employment be rejected. Def.'s Motion Ex. 11. However, she readily admits that she spoke with Superintendent Wheelock about plaintiff. Overrocker Aff. ¶¶ 3-4. In particular, Overrocker testified in her deposition that:

A.      I stated [to Superintendent Wheelock] that "I would either abstain or vote no, because I would not want my child in a classroom with Mr. Musante."

Q       Was there any further discussion on that?

A       I explained to Mr. Wheelock that I had Mr. Musante verbally attack me in my office, in a rage, that he didn't want high school students in his classroom.

Id. According to Overrocker, her conversations with Superintendent Wheelock about plaintiff were "privileged" because she "did not believe [she] was acting as an employee of the College" at the time they occurred but rather "acting solely in [her] roles as President of the Board of Education and as the parent of a child attending school within the [SVCSD]." Overrocker Aff. ¶¶ 6, 8-9. Plaintiff, for his part, denies ever "attacking Overrocker in a rage." Musante Aff. ¶ 8.

On September 9, 2014, Joseph Bottini, someone familiar with SVCSD's hiring process, e-mailed Musante about his employment application. Spicer Aff. Ex. I. According to Mr. Bottini's e-mail, he had spoken to Zane Mahar, the SVCSD High School Principal, who told him that plaintiff's application "was pulled due to a complaint" from Overrocker. Id. However, in his deposition Bottini later denied hearing this information. Spagnoli Aff. Ex. 3.

Finally, Musante states that Vince Tramacera, a Staffworks employee, informed him that an MVCC representative had told Staffworks that plaintiff "was not permitted on MVCC grounds and, further, that [he] was not eligible for re-hire." Musante Aff. ¶ 54.

Since these events, Musante has "had extreme difficulty in obtaining full-time employment." Musante Aff. ¶ 54. According to plaintiff, MVCC has "negatively influenced at least two potential employment opportunities"—SVCSD and Staffworks. See id.

## III.  **LEGAL STANDARD**

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Anderson, 477 U.S. at 250 n.4.  The failure to meet this burden warrants denial of the motion. Id.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553.  Accordingly, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation

omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## IV.  DISCUSSION

MVCC contends it properly terminated Musante "based on complaints from students that he told personal sexual stories in class that had nothing to do with the materials being taught, and that he engaged in other inappropriate comments and conduct."  Def.'s Mem. at 3.[4]  According to the College, plaintiff's various discrimination claims must fail because there is absolutely no evidence that "any other professor was ever the subject of such student complaints."  Id.  And even beyond these complaints, the College emphasizes "several matters of concern," such as the blow-up doll incident and plaintiff's overreactions to student disciplinary issues, that had already been recorded in plaintiff's employment file by that point.  See id.

Musante, however, contends that those prior matters had been appropriately resolved and that the complaints which prompted MVCC's investigation came from students who clearly had an axe to grind against him.  See Pl.'s Opp'n at 3.  In his view, Evans-Dame deliberately failed to conduct an honest, unbiased investigation into the precise nature of plaintiff's classroom behavior.  As plaintiff tells it, Evans-Dame and others disapproved of how he, an older male professor, conducted himself around campus and seized on flimsy evidence provided by disgruntled students to justify his termination.

Musante further argues that the initial decision to suspend him with pay later became a decision to terminate him as a retaliatory measure in response to the discrimination

_____

[4]  Pagination corresponds with CM/ECF.

complaint he lodged with Evans-Dame.  In addition, plaintiff claims that Overrocker's defamatory statements to Superintendent Wheelock were retaliatory in nature.

**A.  <u>Discrimination</u>** (Second, Third, Fourth, and Fifth Causes of Action)

MVCC contends Musante's age and gender discrimination claims cannot survive summary judgment because plaintiff "never actually presented evidence that any younger or female professor engaged in similar misconduct."  Def.'s Mem. at 15.  Plaintiff contends he has identified several younger, female professors who lectured on similar sexual themes without facing discipline.  Pl.'s Opp'n at 9-11.

The parties agree that Musante's age- and gender-based discrimination claims are subject to the analytical framework first introduced in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), a three-part burden-shifting scheme laid out by the Supreme Court in an effort to "sharpen the inquiry into the elusive factual question of intentional discrimination."  <u>Bucalo v. Shelter Island Union Free Sch. Dist.</u>, 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted); <u>Bader v. Special Metals Corp.</u>, 985 F. Supp. 2d 291, 305 (N.D.N.Y. 2013) (Kahn, J.) (applying framework to plaintiff's Title VII, ADEA, and HRL claims).[5]

"This framework places the initial burden of establishing a prima facie case of discrimination on the plaintiff, who must demonstrate that:  (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination."  <u>Croons v. N.Y. State Office of Mental Health</u>, 18 F. Supp. 3d

---

[5]  In <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), the Supreme Court set forth an alternative framework available in Title VII cases where "a plaintiff can produce direct evidence of discrimination."  <u>Weber v. FujiFilm Med. Sys. U.S.A., Inc.</u>, 854 F. Supp. 2d 219, 231 (D. Conn. 2012).

193, 202 (N.D.N.Y. 2014) (citing <u>Ruiz v. Cty. of Rockland</u>, 609 F.3d 486, 491 (2d Cir.

2010). "A plaintiff's burden of establishing a *prima facie* case is *de minimis*." <u>Abdu–Brisson</u>

<u>v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 467 (2d Cir. 2001).

 Once the plaintiff clears this initial hurdle, "[t]he burden then shifts to the defendant to

offer 'legitimate and non-discriminatory reasons for the adverse employment action

demonstrate in plaintiff's prima facie case.'" <u>Croons</u>, 18 F. Supp. 3d at 202 (quoting <u>Risco v.</u>

<u>McHugh</u>, 868 F. Supp. 2d 75, 99 (S.D.N.Y. 2012)).

 The burden at this stage is also "light," and "[t]he employer need not persuade the

court that it was motivated by the reason it provides; rather it must simply articulate an

explanation that, if true, would connote lawful behavior." <u>Croons</u>, 18 F. Supp. 3d at

202-03 (citation omitted). In other words, "[t]his burden is one of production, not persuasion;

it can involve no credibility assessment." <u>Id.</u> (citation and internal quotation marks omitted).

 "If the defendant satisfies its burden of production, then the presumption raised by the

prima facie case is rebutted and drops from the case." <u>Bucalo</u>, 691 F.3d at 129 (citation and

internal quotation marks omitted). "At the final stage, the plaintiff then has 'the opportunity to

demonstrate that the proffered reason was not the true reason for the employment

decision'—a burden that 'merges with the ultimate burden of persuading the court that [ ]he

has been the victim of intentional discrimination.'" <u>Id.</u> (quoting <u>Texas Dep't of Cmty. Affairs v.</u>

<u>Burdine</u>, 450 U.S. 248, 256 (1981)).[6]

 "[I]n order to raise an issue of fact that is sufficiently material to defeat a motion for

summary judgment, the plaintiff must produce more than simply some evidence; it must be

---

  [6] "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" <u>Croons</u>, 18 F. Supp. 3d at 203 (quoting <u>Risco</u>, 868 F. Supp. 2d at 99).

enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a pretext to disguise discrimination." Croons, 18 F. Supp. 3d at 203 (citation omitted). In making this determination, a court may examine "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." Bader, 985 F. Supp. 2d at 305.

MVCC appears to concede that Musante, a male over forty years of age, is a member of protected classes recognized by Title VII, the ADEA, and HRL. However, the College contends that plaintiff still cannot establish a prima facie case of either age or gender discrimination because he has failed to identify any similarly situated comparators.

In support of this argument, the College faults plaintiff for being "evasive" in his deposition testimony when questioned about his knowledge of younger and/or female professors who had lectured on similar themes in a similar manner. The College also emphasizes plaintiff has failed to identify anyone whose classroom misconduct brought on a similar "flood" of student complaints.

These arguments are rejected. First, "Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action." Howard v. MTA Metro-North Commuter R.R., 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) (collecting cases); see also Bader, 985 F. Supp. 2d at 313 (adopting same approach in an effort to "avoid redundancy").

Assuming otherwise and examining the merits of Musante's prima facie showing by viewing the evidence in the record in the light most favorable to him, he has satisfied the "minimal" burden that the first step of the McDonnell Douglas framework demands. Among other things, plaintiff testified that he possessed personal knowledge about how his teaching methods were similar to several other comparators; knowledge he claims to have gained during the course of his direct mentoring relationships with these professors. Def.'s Motion Ex. 10; Musante Aff. ¶¶ 16-17.

Beyond that, MVCC begs the question by attempting to use the student complaints against Musante as a way to divide him from his similarly situated peers. According to the College, none of these other professors engaged in the same misconduct as plaintiff, a fact which it asserts conclusively defeats any determination that any of his fellow professors were similarly situated to him. But while that may ultimately prove true, plaintiff himself denies engaging in the misconduct described in the students' complaints.

This distinction proves relevant here because one of Musante's principal assertions is that the investigation into the student complaints—that is, complaints from troubled students with a motive to spout falsehoods or exaggerations—was the pretextual vehicle through which MVCC ultimately effected his termination, since the College allegedly knew of, and permitted, younger and/or female professors to teach classes concerning the same sexual subject matter in a similar manner.

At the very least, the parties' disputes over these issues are better resolved by a finder of fact. See Dall v. St. Catherine of Siena Med. Ctr., 966 F. Supp. 2d 167, 183 (E.D.N.Y. 2013) (observing that the similarly situated question is ordinarily one that should be submitted to a jury); cf. id. at 185 (declining to conclude the plaintiff's conduct was

"objectively more serious" than that of proposed comparators and instead concluding it "is a decision best left for the jury").

Even putting this issue aside and assuming Musante failed identify one or more suitable comparators, the complex sequence of events leading to plaintiff's termination that are described in the summary judgment record would alone suffice to state a prima facie case of discrimination.

"A showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a prima facie case of discrimination, but it 'is only one way to discharge that burden.'" McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001) (quoting Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001)).

That is because the fourth element of a plaintiff's prima facie case is a "flexible one that can be satisfied differently in differing factual scenarios." Howard, 866 F. Supp. 2d at 204; see also Dall v. St. Catherine of Siena Med. Ctr., 966 F. Supp. 2d 167, 182 (E.D.N.Y. 2013) ("No one particular type of proof is required to show that [p]laintiff's termination occurred under circumstances giving rise to an inference of discrimination.").

Turning to the second step of the McDonnell Douglas framework, MVCC has carried its burden of identifying a legitimate, nondiscriminatory reason for Musante's termination which, taken as true, would permit the conclusion that his termination was nondiscriminatory. Def.'s Motion Ex. 30. According to the College, plaintiff "was terminated based on multiple students' complaints that he was telling stories of his own personal sexual experiences, swearing at students, and engaging in other inappropriate comments and

conduct, all *unrelated to the material he was teaching.*" Def.'s Mem. at 16 (emphasis in original).

The remaining question is whether Musante can demonstrate that this stated reason is a mere pretext, a showing which can be made "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Campbell v. Cellco P'ship</u>, 860 F. Supp. 2d 284, 302 (S.D.N.Y. 2012) (citation omitted); <u>see also</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993) ("[R]ejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.").

"A discrimination claimant may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." <u>Bombero v. Warner-Lambert Co.</u>, 142 F. Supp. 2d 196, 203 n. 7 (D. Conn. 2000) (citations omitted).

"Where a plaintiff offers evidence of pretext, courts must take a "case-by-case approach" and examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" <u>Tu Ying Chen v. Suffolk Cty. Cmty. Coll.</u>, 2017 WL 2116701, at *6 (E.D.N.Y. Mar. 31, 2017) (quoting <u>Schnabel v. Abramson</u>, 232 F.3d 83, 90 (2d Cir. 2000)).

On this final issue, MVCC's summary judgment motion raises more questions than it manages to answer. Neither party has yet bothered to describe in detail the mechanics of the College's typical investigative process. And that omission turns out to be somewhat

important here, because the two complaints that kicked off the investigation ultimately leading to plaintiff's termination certainly appear to have come from students with an "axe to grind," just as plaintiff continues to claim.

Even after the investigative process gathered some momentum, records of the eighteen student interviews Evans-Dame conducted appear to have produced only a minority of negative student comments which, taking as true Musante's assertions about the pre-existing disciplinary issues of those particular complainants, seem an unreliable basis on which to sustain any finding of misconduct, let alone termination.

The legitimacy of this disciplinary outcome is further undermined by the fact that the investigation was a solo affair conducted by Evans-Dame. Viewed in the light most favorable to Musante, Evans-Dame was an MVCC employee biased by her own disapproval of plaintiff's prior on-campus behavior, a fact evidenced in part by the parties' sharply contrasting characterizations of the "blow-up doll" incident on an otherwise "sex-positive" college campus.

And assuming for present purposes that MVCC was on notice that younger and/or female faculty members did in fact conduct lectures on similar topics using similar teaching methods and were permitted to do so without incident while Musante's conduct alone drew disciplinary scrutiny, a significant cloud begins to form over the legitimacy of the disciplinary process that led to his termination.

If this were a criminal matter, a fact finder weighing the question of whether misconduct occurred under these circumstances would almost certainly conclude that reasonable doubt existed. Indeed, the description of the investigation available in the present record would most likely fail to even persuade a civil jury under the more lenient

- 26 -

preponderance of the evidence standard. Of course, MVCC's internal disciplinary system is not necessarily obligated to adhere to those kind of formal, relatively demanding legal standards.

But what kind of rules, if any, was it obligated to follow? Are solo investigations like the one that occurred here par for the course? Does MVCC regularly reach conclusions in disciplinary matters that appear to run against the weight of the evidence it has gathered? Are there any procedures in place for evaluating the credibility of the complainants? Were those procedures applied here? Is there any requirement of a disinterested decision-maker, a standard that Evans-Dame arguably fails to meet?

Evidence demonstrating how MVCC's process adhered to one or more of these investigative norms would tend to support the College's proffered explanation for its conduct in this case, since the reason asserted for Musante's termination would look far less pretextual if it in fact turned out to be the product of a fair, thorough, and regularly employed investigative process. But viewed in the light most favorable to plaintiff, the record as it stands now makes it appear that the termination was a haphazard affair conducted at the hands of someone with whom plaintiff had already butted heads.

In a similar vein, the parties engage in lengthy disputes about past interactions between Evans-Dame and Musante, including the blow-up doll incident and the Counseling Memorandum. The College repeatedly references these past events throughout its motion papers, but it is not clear why. Did these prior incidents somehow alter the quantum of proof required for Evans-Dame to substantiate the latest student complaints or permit her to recommend termination as opposed to another, lesser sanction? Does the College's disciplinary process approve of decision-making based on past evidence of an accused's bad

character or based on an investigator's subjective belief that plaintiff had a propensity to engage in professional misconduct of a sexual nature? These questions also remain unanswered.

MVCC insists that it simply relied on the natural outcome of its investigation and that there was nothing at all unusual about Evans-Dame's decision to "substantiate" the students' complaints about Musante's inappropriate classroom behavior. But viewing the available evidence in the light most favorable to plaintiff, he has presented a legitimate challenge to the reasonableness of the College's reliance on that investigation, casting doubt on the legitimacy of its outcome as a neutral explanation for his termination.

That is especially so in this case, where Musante contends that Evans-Dame's decision-making was colored by her own ageist or sexist opinions about how an older male professor should conduct himself in the classroom, and that her prior disapproval of his on-campus behavior is evidence of her animus. According to plaintiff, she seized on the opportunity to terminate him when she learned that a small cadre of troubled students finally provided her a pretextual basis on which to do so.

To be sure, that theory of unlawful gender and/or age discrimination is far from the most compelling one ever advanced under the anti-discrimination laws. But neither is it so far-fetched or, more importantly, utterly lacking in factual support such that no reasonable jury could find it sufficiently persuasive so as to return a verdict on it in Musante's favor. Accordingly, the College's motion for summary judgment will be denied.[7]

---

[7] While Musante's gender discrimination claim will only require him to prove that it was a motivating factor behind the adverse action, his age discrimination claim will ultimately require him to prove it was a but-for cause. See, e.g., Stouter v. Smithown Cent. Sch. Dist., 687 F. Supp. 2d 224, 233-34 (E.D.N.Y. 2010).

**B. Retaliation** (Sixth and Seventh Causes of Action)

MVCC contends Musante's retaliation claim must be dismissed because he was already "being investigated upon reports of severe misconduct when he first claimed the investigation was prompted by sex discrimination." Def.'s Mem. at 18. According to the College, "[a]n employee in the midst of an investigation with termination a likely outcome cannot convert the situation to his advantage by interposing a claim of discrimination, and thereby clothing any result in the dress of retaliation." Id.

Musante responds that there was absolutely no indication from MVCC that termination was even a possibility at the time he was initially informed of the investigation. Pl.'s Opp'n at 16. According to plaintiff, "[i]t was only after [he] had engaged in protected activity that termination became an option." Id. In addition, plaintiff argues that Overrocker retaliated against him by making defamatory statements to Superintendent Wheelock.

"Claims of retaliation for engaging in protected conduct under Title VII and [the HRL] are examined under the McDonnell Douglas burden shifting test." Joseph v. Owens & Minor Distrib., Inc., 5 F. Supp. 3d 295, 315 (E.D.N.Y. 2014) (footnote, citation, and explanatory parenthetical omitted).

A retaliation plaintiff must first establish a prima facie case by showing that: (1) he participated in a protected activity; (2) the defendant knew of the protected activity; (3) he suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse action. Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 70 (2d Cir. 2015).

In the context of a retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of

discrimination.'" <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 90 (2d Cir. 2015) (quoting <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 57 (2006)). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination. . . '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" <u>Id</u>.

If the plaintiff sustains this initial, minimal burden, a presumption of retaliation arises, which the employer may rebut by articulating a legitimate, non-retaliatory reason for the adverse action. <u>Ya-Chen Chen</u>, 805 F.3d at 70. "If the defendant provides such an explanation, the presumption of retaliation dissipates and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action." <u>Id</u>. (internal citations and quotation marks omitted).

MVCC argues that Musante cannot establish a causal connection between his December e-mail first complaining about discrimination and his later termination. According to the College, "no inference of retaliation can be drawn" in cases where "an employer is already in the process of deciding on adverse action, or has made the decision to take action but has not yet implemented that decision." Def.'s Mem. at 18.

Again, though, regardless of the merits of Musante's claim, MVCC has resorted to question-begging at this juncture. The College asserts, without further explication or evidentiary support, that termination was the "likely outcome" of the investigation and that "the possibility of termination was already out there." And that may well be the sort of possibility floated during meetings conducted between plaintiff and representatives from the

College.  It may also be the sort of outcome explicitly contemplated by the College's disciplinary process.

But the current record does not include any clear indication that this was the case, making Musante's claim distinguishable from cases cited by MVCC in which plaintiffs fail to demonstrate causality because they were already on explicit notice of the adverse action that only later occurred.  See, e.g., Roberts v. Health Ass'n, 308 F. App'x 568, 570 (concluding plaintiff failed to state FMLA retaliation claim where employer had "already informed [plaintiff] that her job was in jeopardy").

The College's second argument—that Musante cannot "overcome the fact that the student complaints were a legitimate, nonretaliatory reason for his termination"—fails for substantially the same reasons it fails with respect to plaintiff's discrimination claims.  Def.'s Mem. at 20.  Accordingly, these claims remain for trial.

C. **Defamation** (Eighth Cause of Action)

Finally, MVCC contends Musante's defamation claim must be dismissed because he has failed to identify sufficient admissible evidence to support his claim.  The College insists that Overrocker's comments to Superintendent Wheelock were (1) true statements (2) protected by privileged that (3) ultimately caused plaintiff no harm; and, in any event, (4) fell outside the scope of her employment with the College.

Musante responds that Overrocker's own deposition testimony recounts a story she told to Superintendent Wheelock about plaintiff behaving inappropriately at the College in response to Wheelock's questioning about plaintiff's fitness to teach at SVCSD.  Def.'s Motion Ex. 11.  According to plaintiff, Overrocker's story about his inappropriate behavior is

wholly false and has "crushed" his prospects of advancing beyond the role of "substitute teacher" at SVCSD.  Musante Aff. ¶ 8.

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name.  Generally, spoken defamatory words are slander; written defamatory words are libel."  Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001) (citations and internal quotation marks omitted).

"To prevail on a claim for either libel or slander under New York law, plaintiff must show (I) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting [defamation] *per se*, and (vii) not protected by privilege."  Neal v. Asta Funding, Inc., 2014 WL 3887760, at *2 (S.D.N.Y. June 17, 2014) (citations and internal quotation marks omitted).

After reviewing the parties' submissions, disputed issues of fact preclude summary determination of this claim.  Accordingly, this claim will also remain for trial.

## V.  **CONCLUSION**

In light of the various disputed facts as well as the numerous gaps in the current evidentiary record, an unbiased disposition of Musante's claims is better left to a jury.

Therefore, it is

ORDERED that

1.  Mohawk Valley Community College's motion for summary judgment is DENIED;

2.  Musante's discrimination, retaliation, and defamation claims REMAIN for trial;

3.  A jury trial will begin in Utica, New York, on February 12, 2018; and

3.  Pre-trial submissions shall be filed on or before February 2, 2018.

IT IS SO ORDERED.

Dated:  September 18, 2017
         Utica, New York.

_____
United States District Judge